The Law Office of D. John Djordjevich
Kierland Corporate Center
7047 E. Greenway Parkway, Suite 250
Scottsdale, AZ 85254
Phone: (480) 621-7150
Fax: (866) 464-6048
D. John Djordjevich, Esq. (021054)
john@djazlaw.com

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| InfoArmor, Inc., d/b/a/ Allstate Identity Protection,<br><br>        Plaintiff,<br><br>v.<br><br>Karen Ballard,<br><br>        Defendant. | Case No.<br><br>**VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF** |

Plaintiff InfoArmor, Inc. d/b/a Allstate Identity Protection ("AIP") alleges as follows for its Verified Complaint for Injunctive and Other Relief against Defendant Karen Ballard ("Ballard").

## NATURE OF THE ACTION

1. This action is the result of Defendant Ballard failing to comply with certain promises and obligations Ballard made when, on January 3, 2017, she executed the Employee Confidentiality, Proprietary Rights, Non-Competition, and Non-Solicitation Agreement (the "Agreement") with InfoArmor, Inc.[1], which does business as AIP. Under

---

[1] In October 2018, the Allstate Corporation acquired InfoArmor, Inc. which does business as Allstate Identity Protection. Pursuant to Section 10.3 of the Agreement, the terms of the Agreement are binding on Ballard and "will be for the benefit of the

the Agreement, Ballard operated as a Sales Director for AIP in a region that included Colorado, Utah and Wyoming and primarily serviced AIP brokers/clients in the middle market employee benefits channel.

2.  As a Sales Director, Ballard had access to substantial amounts of proprietary and trade secret information about AIP's business, products, and its brokers. Ballard was also responsible for cultivating, growing and servicing some of AIP's largest brokers in the employee benefits channel, including HUB International.

3.  Under the Agreement, Ballard (1) acknowledged that she would be granted access to AIP proprietary information and broker relationships; (2) agreed to hold such confidential information "in strictest confidence" and not to use or disclose that information except as may be required through her work for AIP; (3) promised, for 12 months following her termination, not to work for a competitor that offered the same or similar goods, services or products as AIP; and (4) promised, for 12 months following her termination, not to solicit active or prospective AIP brokers with whom Ballard directly worked or solicited as an employee of AIP for the purpose of selling the same or similar products, goods, or services as she provided on behalf of AIP.

4.  Ballard's relationship with AIP terminated on October 4, 2021 when she unexpectedly resigned. Despite the express terms of the Agreement, Ballard had already accepted a position with LifeLock. LifeLock is AIP's largest and primary competitor.

---

Company, its successors, and its assignees. Company may assign its rights under this Agreement to any successor in interest or other assignee."

5. On October 11, 2021, Ballard started her new position as Sales Director for LifeLock. Ballard's position at LifeLock is the *exact same* position, in the *exact same* territory, selling competing products to the *exact same* brokers in the employee benefits channel as she worked with at AIP.

6. Even more egregious, in her first week at LifeLock, Ballard immediately solicited her biggest account, HUB International, converting five sales to LifeLock and taking her primary HUB contact in Colorado to a hockey game.

7. Ballard's actions are a clear breach of the Agreement and common law. Ballard's conduct threatens significant and continuing irreparable harm to AIP. As a result, injunctive relief against Ballard's misconduct is necessary and appropriate to prevent further injury to AIP.

8. Consequently, AIP now brings suit against Ballard for breach of contract and tortious interference with business relationships. In doing so, AIP requests that this Court enter an order (1) enjoining Ballard, and anyone acting in concert with her, from using, possessing or having access to AIP confidential information; (2) enjoining Ballard from working for LifeLock in a competitive position to the one she held with AIP through at a minimum, October 4, 2022; (3) enjoining Ballard, and anyone acting in concert with her, from soliciting AIP brokers and prospective brokers whom Ballard worked with or solicited while employed by AIP through, at a minimum, October 4, 2022; and (4) awarding AIP actual, compensatory and exemplary damages for Ballard's intentional and willful acts.

76787815v.2

## THE PARTIES AND RELEVANT ENTITIES

9. InfoArmor, Inc. is a Delaware corporation with its principal place of business located in Scottsdale, Arizona.

10. Upon information and belief, Ballard is a citizen of the State of Colorado and resides in Glendale, Colorado.

## JURISDICTION AND VENUE

11. This Court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a), because this action and controversy is between citizens of different states and exceeds the value of $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over Ballard, and venue is proper in this District under 28 U.S.C. 1391(a) pursuant to the Agreement, which has a valid forum selection clause selecting Arizona.

13. Venue is also proper because Ballard has committed and continues to commit tortious acts that have caused harm to AIP in Arizona. Additionally, AIP's principal place of business is in Scottsdale, Arizona and it regularly conducts business in Arizona.

## EVENTS GIVING RISE TO THIS ACTION

### AIP's Business And Protection Of Confidential Information

14. AIP is one of the nation's leading providers for identity and privacy protection to businesses and individuals. AIP's identity and privacy protection plans use AIP's innovative and patented technology to provide its clients digital protection.

4

15. AIP's products and services include the Allstate Digital Footprint™ for privacy management, fraud alerts, dark web monitoring, financial monitoring, customer support and coverage for fraud victims.

16. AIP products, plans and services are sold through a few primary channels: individuals, businesses, and brokers.

17. The identity protection industry is highly competitive.

18. AIP dedicates a significant amount of time and resources developing its state of the art technology, creating new innovative protection products, cultivating client relationships and creating goodwill among its clients, by among other things, providing a high level of customer service.

19. AIP sells its products and services through sales directors and representatives such as Ballard. AIP product sales are highly dependent upon the relationships developed between the sales force and the clients, and the clients rely on the sales employees to have a deep understanding of the clients' needs, provide in-depth knowledge about the products and services, provide technical assistance and introduce new technology, and suggest products that would be of interest to the clients in their sales channel.

20. In order to provide this level of service, Ballard, like other sales directors and representatives, had substantial access to AIP's confidential information, business strategies and technology development. In addition, Ballard, like other sales directors, spent significant time interacting with AIP accounts to develop detailed knowledge of client's preferences, and to understand which AIP products and services would best meet AIP's clients' needs.

21. To that end, training and access to AIP confidential, proprietary, and trade secret information are critical to a sales director's success.

22. AIP makes substantial and continuous investment in the training and education of its sales force to ensure the sales directors and representatives are equipped with comprehensive company and product information. Such training includes both external sales training as well as internal training twice per year related to AIP's internal processes and business updates from the marketing, implementation, and customer service groups. Ballard also participated in sales strategy working sessions twice per year.

23. Sales directors and representatives are provided access to confidential and proprietary information relating to AIP products and new technology and product development and pipelines for new products; company-wide strategies and business projections; as well as regional and channel specific product development, pipelines, long-term and short-term sales strategies, marketing plans and promotional strategies for AIP products, broker relationships and contacts, detailed pricing information and competitive strategies.

**BALLARD'S EMPLOYMENT WITH AIP**

24. Ballard began working as a Sales Director for InfoArmor, Inc. on January 1, 2017 and executed the employee Confidentiality, Proprietary Rights, Non-Competition, and Non-Solicitation Agreement ("Agreement"). (*See* Agreement, a true and correct copy of which is attached as Exhibit A).

25. In October 2018, Allstate Corporation acquired InfoArmor, Inc. which now does business as Allstate Identity Protection.

26. At the time of the acquisition, Ballard maintained her position as Sales Director and became an employee of AIP. Ballard's Agreement with InfoArmor, Inc. was assigned to AIP. (Ex. A, Agreement ¶ 10.3).

27. From January 2017 through her resignation on October 4, 2021, Ballard operated as a Sales Director for the AIP region covering Colorado, Wyoming, Utah and Southern California.

28. Ballard's primary sales efforts in that region were focused on the employee benefits space selling through brokers in that channel.

29. Sales in the employee benefits channel concentrated on Employee Protection Solutions ("EPS").

30. In other words, Ballard worked exclusively with AIP's broker clients ("brokers") who offered EPS products as part of their portfolio employee benefits plans.

31. EPS products in the employee benefits channel can only be sold through brokers and AIP does not and cannot make sales directly to employers for their benefits plans.

32. The sale of EPS products through brokers for employee benefits plans makes up approximately 95% of AIP's revenue.

33. As a Sales Director, Ballard was responsible for developing and managing broker relationships and sales pipelines, promoting AIP's brand and services to prospective brokers, and meeting EPS revenue goals within her assigned territory and across pre-determined national broker relationships. Ballard also regularly collaborated with Sales Leadership on sales strategy and tactics by helping position the organization's value

proposition in the market, overcoming channel challenges, partnering with brokers to internally operationalize relationships, socializing and communicating best practices to EPS stakeholders, and managing accountability with the sales team.

34. In her region, Ballard serviced and managed accounts for approximately 13 brokers.

35. One of Ballard's primary accounts, and one of AIP's largest brokers, was HUB International.

**BALLARD'S CONTRACTUAL OBLIGATIONS TO AIP**

36. In exchange for signing the Agreement, Ballard received employment and compensation, access to and receipt of AIP's trade secrets and confidential information, access to long-term broker relationships and substantial training.

37. Pursuant to her Agreement, Ballard agreed that she would have access to AIP confidential and proprietary information and that all such information must be held in the "strictest confidence." (*Id.* ¶¶ 1.1, 7).

38. The Agreement defines proprietary information as:

[A]ny and all non-public knowledge, data, or information of the Company, [including but not limited to] (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, and other software and related documentation, data, programs, other words of authorship, know-how, techniques, methodologies, processes, and any improvements or other derivations or modification to any of the foregoing; (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets, unpublished financial statements, licenses, prices and costs, suppliers and customers; and (c) information regarding the skills and compensation of other employees of the Company.

(*Id.*, ¶ 1.2) (hereafter "Confidential Information").

39.     Given AIP's legitimate interest in protecting its Confidential Information, Ballard specifically agreed that she would not "disclose or use" any Confidential Information except as may be required in connection with her work for AIP. She also expressly recognized that any Confidential Information was the sole property of AIP. (*Id.* ¶1.1).

40.     The Agreement also contains post-employment restrictive covenants, which are designed to protect AIP's goodwill, long-standing broker relationships and Confidential Information.

41.     Pursuant to the Agreement, Ballard agreed that during her employment with AIP and for twelve months after termination of her employment, she would not:

> [E]ngage in any employment or business activity which is competitive with, or which offers or may offer any products, goods or services which are or would be reasonably construed to be competitive with the Company.

(*Id.* ¶ 4.1) (hereafter referred to as the "Non-Compete Provision").

42.     Additionally, pursuant to the Agreement, Ballard agreed that during her employment and for twelve months after termination of her employment, she would not:

> [D]irectly or indirectly solicit, do business with, call upon, handle, deliver products or goods, or render services to any active or prospective customer of the company with whom [she] alone or in combination with others, have worked or solicited as an employee or affiliate of the Company for the purpose of soliciting or selling such customer the same, similar, or related products, goods or services that [she] provided on behalf of the Company.

(*Id.* ¶ 4.2) (hereafter referred to as the "Non-Solicit Provision").

43.     Ballard expressly recognized the reasonableness and necessity of the restrictive covenant provisions in the Agreement:

> Because my services are personal and unique and because I may have access to and become acquainted with the Proprietary Information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies the company may have for a breach of this Agreement.

(*Id.* ¶ 7).

44. Lastly, Ballard agreed to Arizona choice of law and venue provisions and consented to the jurisdiction of this Court:

> This Agreement will be governed by and construed according to the laws of the State of Arizona. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Maricopa County, Arizona for any lawsuit filed against me by Company arising from or related to this Agreement.

(*Id.* ¶ 10.1).

**BALLARD'S WORK FOR LIFELOCK AND VIOLATIONS OF THE AGREEMENT**

45. On October 4, 2021, Ballard unexpectedly resigned from AIP.

46. At the time of her resignation, Ballard informed AIP that she had accepted a job with LifeLock. During this conversation, Ballard also acknowledged her Agreement and the restrictive covenants therein, indicating that she had already spoken with an attorney.

47. LifeLock is AIP's biggest competitor in the identity protection industry.

48. Pursuant to the Agreement, Ballard was obligated to notify LifeLock about the Agreement and her "obligations under this Agreement." (*Id.* ¶ 9).

49. Ballard began working for LifeLock on October 11, 2021.

50. Ballard's title at LifeLock is Regional Sales Director with her internal facing title being "Business Development Executive Employee Benefits (Field) 3". Ballard's

territory includes Arizona, Colorado, Montana, Nevada, New Mexico, North Dakota, South Dakota, Utah and Wyoming and her responsibilities including "focusing on middle market benefits brokers." (Correspondence regarding Ballard's position with LifeLock attached as Exhibit B).

51. In other words, at LifeLock, Ballard is working in the same position, in the same territory, servicing the same channel, and working with the same brokers as she did while employed by AIP.

52. On October 12th, AIP sent a cease and desist letter to Ballard insisting that she comply with her contractual obligations. (A true and correct copy of the letter sent to Ballard is attached as Exhibit C).

53. AIP also sent a letter to LifeLock, notifying the company of Ballard's post-employment obligations owned to AIP. (A true and correct copy of the letter sent to LifeLock is attached as Exhibit D).

54. After sending the letters and communicating with Ballard's attorney regarding her employment with LifeLock, AIP disturbingly learned that Ballard had been actively soliciting the brokers she worked with on behalf of AIP.

55. Specifically, in her first few weeks of employment with LifeLock, Ballard contacted and solicited her primary broker contact at HUB, International and made at least five sales on behalf of LifeLock.

56. Even more egregious, AIP learned that Ballard, along with her supervisor at LifeLock, had also already organized and treated the HUB International broker to a night out at a hockey game to further solicit HUB's business.

57. Upon information and belief, Ballard, has been actively soliciting other AIP brokers with whom she closely worked while employed by AIP.

58. After several correspondence with Ballard's counsel, on October 25th, Ballard, through her counsel, communicated with AIP that Ballard did not intend to abide by the restrictive covenants in the Agreement and would continue working for LifeLock in the same position and territory and continue her solicitation of AIP brokers.

## IRREPARABLE HARM TO AIP

59. Ballard is harming AIP's legitimate business interests by breaching the Agreement and by unfairly competing with AIP.

60. AIP's success depends in large part on maintaining and fostering its broker relationships and goodwill. Those relationships and goodwill depend on the service that AIP provides its brokers.

61. With LifeLock's approval and assistance, Ballard is soliciting and attempting to convert the same AIP brokers that Ballard was entrusted to service on behalf of AIP to purchase competing LifeLock products and services.

62. Thus, Ballard's conduct in both working for a direct competitor in the same position, market and region and directly soliciting her former AIP brokers, places AIP's long-term broker relationships directly at risk.

63. Further, AIP's confidential business information, including strategy, research and development, future projections, client and broker information and business plans are valuable to AIP and Ballard's work for LifeLock in the same region and market and with the same brokers, puts AIP's Confidential Information at risk.

64. If a competitor such as LifeLock obtained and used AIP's Confidential Information, the competitor would be able to unfairly compete with AIP. For example, a competitor could use AIP Confidential Information about brokers and the history on those accounts to contact AIP brokers and offer those brokers products and services based upon terms and conditions that undercut AIP. In fact, that is already happening with one of AIP's largest brokers in the employee benefits channel, HUB International.

65. Injury to AIP is therefore both probable and imminent because Ballard clearly intends to continue to violate her Agreement, improperly working for a competitor, soliciting AIP brokers she formerly worked with, and inevitably using AIP confidential information on behalf of LifeLock—AIP's biggest competitor.

66. Accordingly, AIP is suffering irreparable harm and injunctive relief is necessary and appropriate to prevent further damage to AIP.

## COUNT I
## BREACH OF CONTRACT

67. AIP hereby repeats and realleges and incorporates by reference the allegations contained in Paragraphs 1 through 66.

68. On January 3, 2017, Ballard entered in the Agreement with AIP. (*See* Ex. A).

69. Ballard's Agreement is a valid and enforceable contract.

70. The post-employment restrictive covenants, confidentiality provisions and other provisions contained in the Agreement are reasonable in scope and duration and are reasonably necessary to protect AIP's legitimate and protectable interests in its

Confidential Information and long-standing, well-established and valuable broker relationships.

71. Under the Agreement, Ballard agreed not to use or disclose any AIP Confidential Information for her own benefit or for any improper purpose. (Ex. A, Agreement, ¶ 1.1).

72. Ballard specifically recognized that AIP Confidential Information includes:

(a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, and other software and related documentation, data, programs, other words of authorship, know-how, techniques, methodologies, processes, and any improvements or other derivations or modification to any of the foregoing; (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets, unpublished financial statements, licenses, prices and costs, suppliers and customers; and (c) information regarding the skills and compensation of other employees of AIP.

(*Id.* ¶ 1.2).

73. Ballard also specifically agreed that for one year following her termination, she would not "engage in employment or business activity which is competitive with [AIP]" or offer products, goods or services that compete with AIP. (*Id.* ¶ 4.1).

74. Ballard further agreed that for one year following her termination she would not, directly or indirectly, "solicit, do business with, call upon, handle, deliver products or goods, or render services to any active or prospective customer" of AIP who Ballard worked with or solicited as an employee of AIP for the purpose of soliciting or selling the same or similar products, goods or services that she provided that broker on behalf of AIP. (*Id.* ¶ 4.2).

75. AIP performed all its obligations under the Agreement.

76. Ballard breached the Agreement by (1) using AIP confidential information for an improper purpose; (2) accepting a job with a competing company, LifeLock, selling the same or similar products; and (3) directly soliciting AIP brokers that she worked with at AIP to sell them the same or similar products on behalf of LifeLock.

77. Ballard's breaches of the Agreement have damaged AIP's goodwill, broker relationships and other legitimate business interests.

78. Moreover, Ballard's breaches of the Agreement are continuing and ongoing, and AIP is subject to continuing irreparable harm, economic injury, and damage to its legitimate business interests.

79. As a result of Ballard's breaches of her Agreement, AIP has been irreparably injured, and it continues to face irreparable injury. AIP is threatened with losing the value of its confidential and proprietary information, competitive advantage, broker relationships, and goodwill, in amounts that may be impossible to determine and for which a remedy at law is inadequate. Accordingly, Ballard should be enjoined by Order of this Court.

80. In addition, AIP seeks actual, compensatory, and consequential damages based on Ballard's violations of the Agreement in an amount to be determined at trial.

## COUNT III
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

81. AIP hereby repeats and realleges and incorporates by reference the allegations contained in Paragraphs 1 through 80.

82. Until the events giving rise to this action, AIP maintained valid business relationships or the expectancy of business relationships, with its brokers and prospective brokers, whom Ballard worked with and serviced on behalf of AIP.

83. As a former AIP employee, Ballard was fully aware of these relationships and expectancies.

84. Notwithstanding Ballard's knowledge, Ballard intentionally and unjustifiably has and will continue to interfere with AIP's business relationships with its brokers and/or prospective brokers.

85. Ballard's intentional interference was and is willful, malicious, unjustified, and accomplished through wrongful means, including but not limited to breaching her Agreement, divulging and using AIP's Confidential Information and otherwise violating the law.

86. As a result of Ballard's tortious interference with AIP's prospective economic advantage, AIP has been injured and continues to face injury. AIP is threatened with losing the value of its Confidential Information, competitive advantage, broker relationships, and goodwill.

87. Accordingly, AIP seeks actual, exemplary, compensatory, and consequential damages based on Ballard's conduct in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, InfoArmor, Inc. d/b/a Allstate Identity Protection seeks emergency injunctive relief, judgment in its favor and an Order against Ballard that grants the following relief:

16
76787815v.2

  B. Permanently enjoining Ballard and all parties in active concert or participation with them who receive actual notice by personal service or otherwise, from using or disclosing any of AIP's confidential, proprietary and/or trade secret information;

  C. Enjoining Ballard from working for LifeLock in a position similar to that which she held for AIP, for one year, through October 4, 2022, plus the amount of time in which Ballard failed to comply with her contractual obligations under the Agreement;

  D. Enjoining Ballard, and all of those in active concert or participation with her, from directly or indirectly contacting, soliciting or attempting to solicit AIP's brokers and prospective brokers which Ballard worked with or solicited as an employee of AIP to sell them the same or similar products, goods or services Ballard sold and serviced on behalf AIP for one year, through October 4, 2022, plus the amount of time in which Ballard failed to comply with her contractual obligations under the Agreement;

  E. Awarding AIP actual, incidental, compensatory, and consequential damages to be proven at trial;

  F. Awarding AIP exemplary damages in an amount to be proven at trial due based on Ballard's willful and malicious activities; and

  H. Granting AIP such further relief as the Court deems necessary and just.

  DATED this 2nd day of November, 2021.

**INFOARMOR INC. d/b/a ALLSTATE IDENTITY PROTECTION,,**

By /s/ D. John Djordjevich, Esq. 021054

The Law Office of D. John Djordjevich
Kierland Corporate Center
7047 E. Greenway Parkway, Suite 250
Scottsdale, AZ 85254
Phone: (480) 621-7150
Fax: (866) 464-6048
D. John Djordjevich, Esq.
john@djazlaw.com

*Attorney for Plaintiff*

17

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, __Cynthia Bowers__, on behalf of InfoArmor Inc. d/b/a Allstate Identity Protection, declare under penalty of perjury that the statement set forth in the foregoing Verified Complaint for Injunctive and Other Relief are true and correct except as where such statements are made upon information and belief.

Dated: November 2, 2021

By _/s/ Cynthia Bowers_
Cynthia Bowers
Chief Human Resources Officer
InfoArmor Inc. d/b/a Allstate Identity Protection