**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

InfoArmor Incorporated, d/b/a
Allstate Identity Protection,

                    Plaintiff,

v.

Karen Ballard,

                    Defendant.

No. CV-21-01844-PHX-SMB

**ORDER**

        Pending before the Court is Plaintiff InfoArmor, Inc. d/b/a Allstate Identity Protection's ("Allstate") Motion for a Temporary Restraining Order ("TRO"), (Doc. 12), to which Defendant Ballard filed a Response, (Doc. 20).  Allstate did not reply, but the Court held oral argument on November 18, 2021.  Have considered the parties briefing and arguments, and the relevant case law, the Court will deny Allstate's Motion for the reasons explained below.

### I.    BACKGROUND

        Allstate's Complaint includes two claims: breach of contract and tortious interference with business relationships.  (Doc. 1.)  In their request for a TRO, Allstate focuses only on the breach of contract claim.  (Doc. 12.)  That claim centers on two restrictive covenants signed by Defendant while she was employed by Allstate.  (*Id*. at 16–17.)

        The first covenant provided as follows:

> I agree that during the period of my Affiliation with the Company and for twelve (12) months thereafter, or, in the alternative, in the event any reviewing court finds twelve (12) months to be overbroad in duration and unenforceable, for the period of my Affiliation by the Company and for nine (9) months thereafter, or, in the alternative, in the event any reviewing court finds nine months to be overbroad in duration and unenforceable, for the period of my Affiliation with the Company and for six (6) months thereafter, I will not, without the Company's express written consent, engage in any employment or business activity which is competitive with, or which offers or may offer any products, goods or services which are or would be reasonably construed to be competitive with the Company, including without limitation any investment in or ownership regarding any provider of goods or services which compete with those of the Company (except for a minority interest in a publicly-traded company).

(Doc. 1-2 at 4 § 4.1) (hereafter, the "Non-Compete Provision").  The second covenant provided as follows:

> I agree further that for the period of my Affiliation with the Company and for twelve (12) months thereafter, or, in the alternative, in the event any reviewing court finds twelve (12) months to be overbroad in duration and unenforceable, for the period of my Affiliation with the Company and for nine (9) months thereafter, or, in the alternative, in the event any reviewing court finds nine (9) months to be overbroad in duration and unenforceable, for the period of my Affiliation with the Company and for six (6) months thereafter, I will not, directly or indirectly, solicit, do business with, call upon, handle, deliver products or goods, or render services to any active or prospective customer of the Company with whom I alone, or in combination with others, have worked or solicited as an employee or affiliate of the Company for the purpose of soliciting or selling such customer the same, similar, or related products, goods or services that I provided on behalf of the Company.

(*Id.* at 4 § 4.2) (hereafter, the "Non-Solicitation Provision").

These covenants were contained in an Employee Confidentiality, Proprietary Rights, Non-Competition and Non-Solicitation Agreement (the "Agreement"), which Ms. Ballard signed as a part of her employment with Allstate.  (Doc. 12 at 2.)  The Agreement also provided that Ms. Ballard would have access to confidential and proprietary information, which she was to keep in the "strictest confidence."  (*Id.*)  The Agreement

defined proprietary information as "any and all non-public knowledge, data, or information of the Company," and then provided examples of such information.[1]  (*Id.* at 4 § 1.2.) Notably for purposes of jurisdiction, the Agreement also contained a provision where the parties agreed to Arizona choice of law and venue and consented to the jurisdiction of this Court.  (*Id.* at 5 § 10.1.)

Ms. Ballard began working as a Sales Director for InfoArmor, Inc. on January 1, 2017 and executed the Agreement at that time.  (Doc. 12 at 10.)  Subsequently, Allstate Corporation acquired InfoArmor, Inc., which now does business as Allstate Identity Protection.  (*Id.* at 11–12.)  Ms. Ballard maintained her position as Sales Director and became an employee of Allstate, and the Agreement was assigned to Allstate.  (*Id.* at 12.)

Allstate is one of the nation's top providers of identity and privacy protection plans. (*Id.* at 10.)  Allstate's identity and privacy protection plans use "innovative and patented technology" to provide their clients digital protection, including "Allstate Digital Footprint™ for privacy management, fraud alerts, dark web monitoring, financial monitoring, customer support and coverage for fraud victims."  (*Id.*)  Allstate sells these plans through several channels, including individuals, businesses, and brokers.  (*Id.*)  These plans are sold by Allstate's sales directors and representatives, such as Ms. Ballard, who maintain ongoing relationships with Allstate's clients.  (*Id.*)  Allstate avers that "training and access to AIP confidential, proprietary, and trade secret information are critical to a sales director's success."  (*Id.* at 11.)

As a Sales Director, Ms. Ballard "was responsible for developing and managing broker relationships and sales pipelines, promoting [Allstate]'s brand and services to prospective brokers, and meeting EPS revenue goals within her assigned territory and across pre-determined national broker relationships."  (*Id.* at 12.)  She also collaborated with sales leadership on sales strategy and tactics, and her region included Colorado,

---

[1] The examples of proprietary information included things such as inventions and knowledge about research and development.  (*Id.* at 4 § 1.2.)  The Court notes that many of the examples do not pertain to Ms. Ballard's role of Sale's Director.

Wyoming, Utah and Southern California.  (*Id.*)  She primarily sold Employee Protection Solutions ("EPS")—which can only be sold through "brokers," as Allstate does not, and cannot, make sales directly to employers for their benefits plans.  (*Id.*)  Simply put, Ms. Ballard worked exclusively with Allstate's broker clients.  (*Id.*)  Allstate asserts that "[t]he sale of EPS products through brokers for employee benefits plans makes up approximately 95% of [Allstate]'s revenue."  (*Id.*)  In her region, Ms. Ballard serviced and managed accounts for approximately 13 brokers, with one of her primary accounts—and one of AIP's largest brokers—being HUB International ("HUB").  (*Id.* at 12–13.)

On October 4, 2021, Ms. Ballard resigned from AIP and, seven days later, she began for working for NortonLifeLock Inc. ("NLOK").  (*Id.* at 15.)  According to Allstate, NLOK is Allstate's "biggest competitor in the identity protection industry."  (*Id.*)  Ms. Ballard's title at NLOK is "Regional Sales Director."  (*Id.*)  Her territory includes Arizona, Colorado, Montana, Nevada, New Mexico, North Dakota, South Dakota, Utah and Wyoming, and her responsibilities including "focusing on middle market benefits brokers."  (*Id.*)

In short, Ms. Ballard is working in a similar position, in a similar territory, and with some of the same brokers as she did while employed by Allstate.  Allstate specifically alleges that "in her first few week [sic] of employment with [NLOK], Ballard contacted and solicited her primary broker contact at HUB, International and made at least five sales on behalf of [NLOK]."  (*Id.* at 15.)  By doing so, Allstate claims that Ms. Ballard has breached the Agreement's Non-Solicitation and Non-Competition Provisions, as well as other provisions in the Agreement.  (*Id.* at 8–9.)  Consequently, Allstate requests a TRO.  (*Id.* at 9–10.)  Ms. Ballard counters, among other things, that these contract provisions are unenforceable as a matter of law and, therefore, a TRO is inappropriate.  (Doc. 20 at 1–2.)

## II.    LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action.  The analysis for granting a TRO is "substantially identical" to that for a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n. 7 (9th

Cir. 2001); *Cochran v. Rollins*, No. CV07-1714-PHX-MHMJRI, 2008 WL 3891578, at *1 (D. Ariz. Aug. 20, 2008). "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

## III. DISCUSSION

### A. Likelihood of Success on the Merits

Plaintiff's requested TRO stems from their breach of contract claim. (*See* Doc. 12 at 8–10.) That claim is based on the non-compete and non-solicitation agreements discussed above. (*Id.* at 13–14.) The crux of Defendant's argument is that the agreements are not enforceable. (Doc. 20 at 1–2.)

Arizona law provides that a

[R]estrictive covenant is reasonable and enforceable when it protects some legitimate interest of the employer beyond the mere interest in protecting itself from competition such as preventing competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment.

*Bed Mart, Inc. v. Kelley*, 45 P.3d 1219, 1221 (Ariz. Ct. App. 2002).  Put differently, "[n]on-compete and non-solicitation restrictions are enforceable if they are 'no broader than necessary to protect the employer's legitimate business interest.'"  *Orca Commc'ns Unlimited, LLC v. Noder*, 314 P.3d 89, 95 (Ariz. Ct. App. 2013), *decision aff'd and ordered depublished on other ground*, 337 P.3d 545 (2014) (quoting *Hilb, Rogal & Hamilton Co. of Arizona v. McKinney*, 946 P.2d 464, 467 (Ariz. Ct. App. 1997)).

Thus, "to be enforceable, the covenant must be reasonable with respect to its duration, its geographic scope, and the range of employee's activities affected." *Unisource Worldwide, Inc. v. Swope*, 964 F. Supp. 2d 1050, 1064 (D. Ariz. 2013).  Whether a restrictive covenant is reasonable is a question of law.  *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 366 (1999).  "The burden is on the party wishing to enforce the covenant to demonstrate that the restraint is no greater than necessary to protect the employer's legitimate interest, and that such interest is not outweighed by the hardship to the employee and the likely injury to the public." *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 372, 982 P.2d 1277, 1286 (1999).  Moreover, restrictive covenants "are strictly construed against the employer." *Amex Distrib. Co. v. Mascari*, 724 P.2d 596, 600 (Ariz. Ct. App. 1986).  Allstate cannot carry its burden for either the Non-Compete Provision or the Non-Solicitation provision.

The Non-Compete Provision is unenforceable on its face.  To be enforceable, the provision must contain a reasonable geographic scope.  *Unisource Worldwide*, 964 F. Supp. at 1064.  However, the Non-Compete Provision at issue contains no geographic limitations, making it limitless.  Such a restriction is unreasonable and, therefore, unenforceable.  *See id.*  Allstate cites *Cont'l Promotion Grp., Inc. v. Garvin*, No. CV-08-0070-PHX-SRB, 2008 WL 11338887, at *10 (D. Ariz. May 8, 2008), for the contention that a restrictive covenant may be upheld without a geographic scope and that the Court should engage in a "fact specific inquiry" to reach such a result.  (Doc. 12 at 23.)  Allstate is mistaken.  *Garvin* specifically addressed "a covenant not to compete entered *into in connection with the sale of a business*;" listed slightly different factors for determining the

reasonableness of such a covenant; and explained the different analysis accrued because "[i]n the context of a sale of business, both parties are typically represented by counsel and both have some bargaining power while negotiating the transaction. *See* 2008 WL 11338887, at * 7–8. The case at bar does not involve the sale of a business, and *Garvin* in inapposite here.

Yet, Allstate asks this court to blue pencil the Non-compete provision to make it enforceable. While it is true that Arizona courts follow the "blue pencil" rule, *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 980 (D. Ariz. 2006), this only allows courts to "eliminat[e] grammatically severable, unreasonable provisions" of covenants, *Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 138 P.3d 723, 731 (Ariz. 2006). The blue pencil rule does not, however, "permit courts to add terms or rewrite provisions" to save a restrictive employment covenant. *Id.* (quoting *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1286 (Ariz. 1999)).

Although Allstate has failed to proffer a suggested blue-penciled version of the Non-Compete Provision, *see Mascari*, 724 P.2d at 605 ("[T]he burden is placed upon counsel rather than the court to fashion a legitimate restriction."), their requested TRO gives the Court some idea of the edits they would like to make. In their Complaint, Allstate requests a TRO that is substantially narrower than the Non-Compete Provision. (*Compare* Doc. 1 at 3, *with* Doc. 1-2 at 4 § 4.1.) To enforce the requested TRO in place of the Non-Compete Provision would be tantamount to this Court rewriting the provision to save it. The Court may not, and will not, do so. *See Unisource Worldwide*, 964 F. Supp. 2d at 1067 n. 3; *GlobalTranz Enterprises Inc. v. Murphy*, No. CV-18-04819-PHX-ROS, 2021 WL 1163086, at *9–10 (D. Ariz. Mar. 26, 2021) (declining to blue-pencil a restrictive covenant in an employment agreement, even though the agreement contained a reformation clause).

The Non-Solicitation Provision suffers a similar fate. "Although [employers have] a protectable interest in customer relationships when an employee leaves, an employer has no protectable interest in persons or entities as customers when the employer has no business ties to them." *Noder*, 314 P.3d at 96. But this is the exact type of restriction the

Non-Solicitation Provision places on Ms. Ballard. (*See* Doc. 1-2 at 4 § 4.2). The Non-Solicitation Provision attempts to prohibit Ms. Ballard from soliciting business from "to any active *or prospective customer* of [Allstate] with whom [she] alone, *or in combination with others,* . . . worked or solicited as an employee" of Allstate. (*Id.*) (emphasis added). This language is too board—as it encompasses potential customers—and it is simultaneously too vague because it applies to potential customers who were solicited by other Allstate employees working in combination with Ms. Ballard. *See Noder*, 314 P.3d at 96 (finding unenforceable a non-solicitation covenant that restricted "not only . . . 'actual' customers, but also to 'potential' customers"). As in *Noder*, so it is here; "This definition is so broad that anyone could be included as a potential customer." *Id.* Yet, at oral argument, Allstate insisted that this only provision only applied to the 13 clients whom Ms. Ballard worked with while employed by Allstate. On its face, the provision is far broader than Allstate would have the Court read it.

As with the Non-Compete Provision, Allstate insists that this Court may blue pencil the Non-Solicitation Provision, such that it may be narrow enough to be enforceable. However, the changes asked for by Allstate—reducing the covenant to apply to only those 13 entities with whom Ms. Ballard primarily worked—are far more than the grammatical edits that the blue pencil rule allows. *See Fearnow*, 138 P.3d at 731 (allowing Arizona court to blue pencil only those provisions that at "grammatically severable" (quoting *Farber*, 982 P.2d at 128)). Instead, making the necessary changes would amount to rewriting the provision. The Court declines to do so.

Neither the Non-Competition Provision, nor the Non-Solicitation Provision are likely enforceable. Consequently, Plaintiff has not shown a strong likelihood of success on their breach of contract claim. This factor weighs heavily against granting Plaintiff's requested TRO.

**B. Irreparable Harm**

Irreparable harm is harm for which there is no adequate remedy at law, such as money damages. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

"The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance.  Demonstrating irreparable harm is not an easy burden to fill." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (internal quotation marks and citation omitted); *see also Dalkita, Inc. v. Distilling Craft, LLC*, No. 18-cv-01398-PAB-SKC, 2018 WL 6655628 (D. Col. Dec. 19, 2018).

Allstate argues that it will suffer irreparable harm to valuable broker relationships, goodwill, and legitimate business interests.  (Doc. 12 at 3.)  However, it is undisputed that brokers typically have more than one provider/carrier with whom they do business.  (*See* Doc. 20 at 14–15.)  Indeed, both Allstate and NLOK had pre-existing relationships and business with the one broker/client identified by Allstate: namely, HUB.  (Doc. 20-1 at 22–24; Doc. 21-1 at 4.)  This is not a situation where NLOK was suddenly able to steal HUB away from Allstate.  Rather, Allstate and NLOK both had a relationship with HUB, but HUB chose to do more business with NLOK for reasons completely unrelated to Ms. Ballard.  (*See* Doc. 21-1 at 4.)

Yet, Allstate argues that Defendant was the primary contact with 13 other brokers, and she is undoubtedly using those relationships to benefit NLOK.  (Doc. 12 at 9, 12–13.)  But it presents no evidence to bolster that claim.  While it might be reasonable to assume that Defendant is contacting other brokers, that contact information is public and in no way confidential.  (Doc. 21-1 at 5–6.)

In its Complaint, Plaintiff states:

If a competitor such as LifeLock obtained and used [Allstate]'s Confidential Information, the competitor would be able to unfairly compete with [Allstate].  For example, a competitor could use [Allstate] Confidential Information about brokers and the history on those accounts to contact AIP brokers and offer those brokers products and services based upon terms and conditions that undercut [Allstate].  In fact, that is already happening with one of AIP's largest brokers in the employee benefits channel, HUB International.

(Doc. 1 at ¶ 64.)  That may rise to the level of irreparable harm, but Allstate has presented

no evidence that any confidential information has been used.  The only information that may have been used, if any, is the customer contacts and Ms. Ballard's knowledge about that customer.  As NLOK already had a longstanding relationship with HUB, they already had that information.

Allstate has failed to show that it is being, or will be, irreparably harmed in the absence of a TRO.  Thus, this factor also weighs against granting their requested TRO.

### C. Balance of Equities

"In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) ("In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir.1980))).

Plaintiff is essentially asking for an order that will put Defendant out of work.  Although Plaintiff argues that they are not asking for Ms. Ballard to be fired, there is no work for her to do at NLOK in her current position because NLOK is a competitor.  This is a harsh remedy.  Conversely, there is no evidence of harm being done to Allstate's reputation so—at most—their injury would be financial, and they could be compensated in the form of damages.

Accordingly, this factor also weighs against granting their requested TRO.

### D. Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)) (quotation marks omitted).  It is true that courts "have held that the public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights," and that "enforcing these covenants is consistent with the public policy

of protecting a company's interest in its customer base from unfair competition." *Compass Bank*, 430 F.Supp. 2d at 983.  However, it is also true that "Arizona law does not look kindly upon restrictive covenants." *Unisource Worldwide*, 964 F. Supp. 2d at 1063. Indeed, in Arizona, "[r]estrictive covenants that tend to prevent an employee from pursuing a similar vocation after termination of employment" are especially disfavored. *Murphy*, 2021 WL 1163086, at \*4 (quoting *Bryceland v. Northey*, 160 Ariz. 213, 216 (Ct. App. 1989)); *see Unisource Worldwide*, 964 F. Supp. 2d at 1063.

Furthermore, given that Allstate has not established irreparable harm, the public interest does not favor a TRO.  *See Super Chefs, Inc. v. Second Bit Foods, Inc.*, No. 15-CV-00525-SJOFFMx, 2015 WL 12914441, \*5 (C.D. Cal. June 11, 2015) ("[G]iven that Plaintiff has not shown irreparable harm, the Court finds that a preliminary injunction has not been shown to be in the public interest."); *Sunbelt Rentals, Inc. v. Victor*, No. 13-CV-4240 SBA, 2014 WL 492364, \*11 (N.D. Cal. Feb. 5, 2014) (finding that "the public interest will not be served by entering an injunction to prevent conduct which [the plaintiff] has not shown has or is likely to occur").

Simply put, enforcing unenforceable covenants on former employees does not serve the public interest.  Thus, this factor weighs against granting Allstate's requested TRO.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** denying Plaintiffs Motion for a TRO.  (Doc. 12.)

**IT IS FURTHER ORDERED** that parties discuss scheduling and whether the hearing on the preliminary injunction should be combined with trial on the merits.  The parties shall submit an agreed upon scheduling proposal or, if no agreement is reached, a joint statement that includes each parties proposal by no later than November 29, 2021.

Dated this 19th day of November, 2021.

Honorable Susan M. Brnovich
United States District Judge